UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| S-LINE LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 3:14-CV-2284-M |
| | § | |
| B2B SUPPLY and JERRELL P. SQUYRES, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the Motion for Partial Summary Judgment [Dkt. No. 80], filed by

Defendant Jerrell P. Squyres.  For the reasons stated below, the Motion is **DENIED**.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

This is a patent infringement action brought by the assignee and owner of U.S. Patent No.

7,731,462 ("the '462 Patent") against Jerrell P. Squyres ("Squyres") and B2B Casuals, Inc. d/b/a

B2B Supply.  Squyres moves for partial summary judgment that Plaintiff S-Line LLC ("S-Line")

cannot, as a matter of law, pierce the corporate veil of B2B to hold Squyres individually liable

for alleged patent infringement.

### A.  Squyres and the '462 Patent

Squyres is the co-inventor of the invention entitled "Bulkhead for Dividing a Cargo

Container Into Two Compartments," which was issued as the '462 Patent on June 8, 2010 from

U.S. Patent Application No. 11/776,894 ("the '894 Application").[1]  On May 31, 2007, Squyres

and his co-inventor assigned all of their rights in the '894 Application to JPS Corporation.[2]

---

[1] Dkt. No. 20 ¶ 2 (Pl.'s First Amended Complaint); Dkt. No. 20-1, Pl. Ex. A (the '462 Patent).
[2] Dkt. No. 20 ¶ 34; Dkt. No. 20-1.

Squyres was the founder, president, and sole owner of JPS Corporation.[3]

On or about October 28, 2008, Squyres and JPS Corporation entered into an Asset Purchase Agreement with Ancra International and S-Line LLC,[4] pursuant to which S-Line LLC, a subsidiary of Heico Holding, and an affiliate of Ancra International,[5] purchased the '894 Application from JPS Corporation, acquiring "all right, title and interest in and to" the '894 Application and '462 Patent, including the "right to sue for past and future damages."[6]  Pursuant to an Employment Agreement, Squyres became the Vice President of Sales and Marketing for S-Line, with a salary guaranteed for three years, automatically renewable on an annual basis absent timely notice by either party of intent to terminate the Employment Agreement.[7]  Squyres stayed at S-Line until October 22, 2011, and two years later, Squyres' non-compete and non-solicitation obligations to S-Line expired.[8]  S-Line alleges that Squyres breached his non-solicitation obligations.[9]

On July 13, 2012, Squyres sued Heico, Ancra, and S-Line for breach of contract and age discrimination.[10]  On November 13, 2013, the district court entered summary judgment against Squyres, and the Fifth Circuit affirmed the judgment on April 2, 2015.

---

[3] Dkt. No. 20 ¶ 19.

[4] Ancra International is an affiliate of S-Line and a subsidiary of Heico Holdings, Inc.  Certain managers at S-Line are also managers at Ancra.  The Employment Agreement was between Squyres and S-Line.  Dkt. No. 82, Def. Ex. 10 at A179-A192.

[5] S-Line was formed on September 10, 2008, before the parties entered into the Asset Purchase Agreement.  Dkt. No. 87, Pl. Ex. 8 at B192-93; Dkt. No. 82, Def. Ex. 9 at A141-78.

[6] Dkt. No. 20 ¶¶ 20, 37; Dkt. No. 20-3.

[7] Dkt. No. 82-3, Def. Ex. 10 (Employment Agreement).

[8] Dkt. No. 20 ¶ 32; Dkt. No. 82 at A180.

[9] See Dkt. No. 87, Pl. Ex. 2 at B61-B63, B75-B7; Pl. Ex. 10 at B196-197; Pl. Ex. 5 at B167-B169; Pl. Ex. 6 at B170-B173; Pl. Ex. 11 at B198-B201; Pl. Ex. 12 at B202-B204; Pl. Ex. 13 at B205-B207; Pl. Ex. 14 at B208-B211.

[10] Def. Ex. 11-12.

### B.  B2B Casuals, Inc. and B2B Supply

B2B Casuals, Inc. was incorporated in 2006 for the purpose of operating as a screen and embroidery business selling custom products under the brand name "B2B Casuals."[11]  Squyres' wife, Elizabeth, is the president, sole director, and sole shareholder of B2B Casuals, Inc.[12]  S-Line alleges that Squyres has also held himself out to be the president of B2B Casuals, Inc.[13] B2B Casuals, Inc. claims to have been in good standing with the State of Texas since its incorporation, and to have consistently filed annual public information reports and diligently kept minutes and records of its major corporate decisions.[14]  However, S-Line notes the absence of B2B Casuals, Inc.'s public information reports for 2006-07, 2010, and 2011, and no record of corporate minutes for 2006-07, 2009-10, or 2012.[15]  S-Line further notes that Elizabeth Squyres did not sign the 2011 corporate minutes, and several significant vendor and customer agreements were omitted from the minutes during the relevant time period.[16]

According to Elizabeth Squyres, in 2010, B2B Casuals explored an additional line of business—purchasing and recycling scrap aluminum foil from shipping companies;[17] however, purportedly to keep B2B Casuals and the embroidery line of business separate, B2B Casuals filed an Assumed Name Certificate with the Texas Secretary of State on August 23, 2010, stating

---

[11] Pl. Ex. E; Dkt. No. 2 ¶¶ 23-24, 28; Def. Ex. 1 at A8 (Certificate of Formation); Def. Ex. 3 at A13 (Resolution Adopting Bylaws).

[12] Dkt. No. 2 ¶¶ 24, 26.  S-Line argues that Squyres has a community property interest in Elizabeth Squyres' shares of B2B Supply, Inc.  Dkt. No. 84, Pl. Ex. 4, at 33-34, 37-38.

[13] Dkt. No. 82, Pl. Ex. 3, at 2, A15; Pl. Ex. 4 at 38-39, 118-123, A30, A50-A51; Pl. Ex. 8 at 31-33, 38-39, 108, A95-A97, A114; Pl Ex. 2 at 17-18, 47, 51-53, 119, 214-15, B58, B65-B67, B83, B107; Pl. Ex. 3-4, B158-B161, B165.

[14] Def. Ex. 4 at 19-20, A25 (Dep. of Elizabeth Squyres); Def. Ex. 7 at A76.

[15] Dkt. No. 82, Pl. Ex. 6 at A70-A75.

[16] *Id.*, Pl. Ex. 4 at 63, A36; *Id.* at 20-22, 65-71, A25-A26, A36-A38.

[17] Def. Ex. 4 at 43-44, A31.

3

that it would also conduct business under the name "B2B Supply."[18]  From 2010 to 2013, B2B

Supply carried out the aluminum recycling business with a number of companies, including ABF

Freight Systems, Inc. ("ABF").[19]  B2B Supply has a website, which states that it started business

in November 2013 and assists freight lines with cargo restraint needs.[20]  The website also

indicates that Squyres is the president of B2B Supply.[21]

On or about April 2, 2011, B2B Supply contracted with Hooten's Welding and Hardware

("Hooten's") to break scrapped metal beams into their steel and aluminum components.[22]

Elizabeth Squyres alleges she knew Hooten's owner, Lance Hooten, since Hooten's opened, and

was one of Hooten's first customers; however, that fact is disputed by S-Line.[23]  During the same

time period, B2B Supply was allegedly collaborating with ABF to design and develop furniture

pad bags to use in certain shipping applications; however, that idea was later abandoned.[24]  On or

about January 12, 2012, Elizabeth Squyres and Mike Ray of ABF discussed building deck tables

for use in shipping, and Elizabeth recommended Hooten's to ABF as a reliable source to build

the tables.[25]  ABF hired Hooten's to perform the work, so B2B Supply received a commission

for brokering the deal.[26]  S-Line alleges that Defendant Jerrell Squyres also participated in these

negotiations.[27]

---

[18] Dkt. No. 20 ¶ 29.
[19] Def. Ex. 4 at 44-45, A31.
[20] Pl. Ex. G.
[21] *Id.*
[22] *Id.* at 63-64, A36.
[23] *Id.* at 112, A48; Pl. Ex. 7, B174-B191; Dkt. No. 82, Def. Ex. 3, at 2, A15; Def. Ex. 4 at 38-39, 118-123, A30, A50-A51; Pl. Ex. 8 at 31-33, 38-39, 108, A95, A97, A114.
[24] *Id.* at 89, A42.
[25] *Id.* at 90-91, A43; Def. Ex. 8 at 31, A95 (Dep. of Lance Hooten).
[26] Def. Ex. 4 at 92-93, A43.
[27] Dkt. No. 86 at 10 ¶ 4 (Pl. Resp. Br. at 5).

### C.  B2B Enters Agreement with ABF for Cargo Bulkheads

On November 11, 2013, B2B Supply hired Squyres as a sales agent, and he claims that it was in that capacity that he conducted negotiations with ABF and Hooten's about building removable cargo bulkheads.[28]   However, S-Line alleges that Squyres was listed as the Vice President in B2B's October 17, 2006 unanimous resolutions ratifying bylaws, and that he held himself out as the President of B2B Supply in a YouTube video on B2B Supply's website.[29] Furthermore, Lance Hooten testified that he believed Squyres was "an individual outside of any other companies" in facilitating the ABF transaction, that Squyres "was the mastermind behind the whole deal," and Hooten thought B2B Supply had no involvement.[30]

On April 8, 2014, Mike Ray, of ABF, e-mailed Squyres and his wife to confirm ABF's "binding contract" to purchase the bulkheads.  Squyres responded by e-mail that "[a]ll is go . . . all parts on order . . . ."[31]  S-Line alleges that B2B Supply had insufficient funds to acquire the material, lacked manpower, and lacked facilities to rapidly manufacture the bulkheads it sold for ABF, which caused Squyres and B2B Supply to enter into the agreement with Hooten's.[32]

On or about May 13, 2014, Mark Daugherty, President and General Manager of Ancra, advised ABF that whoever was selling bulkheads to ABF would be infringing S-Line's patents, and stated that Ancra or S-Line would pursue all legal remedies against the seller.  S-Line claims that the design of the bulkheads made by Hooten's for ABF was identical to the bulkhead design sold by S-Line to ABF in 2011 and 2012, except for a difference in the locking device on the

---

[28] Def. Ex. 8 at 33-34, A96 (Dep. of Lance Hooten); Dkt. No. 20 ¶ 8.
[29] Dkt. No. 82, Def. Ex. 4 at A50-A51; Pl. Ex. 3 at B158-B161; Pl. Ex. 4 at B165.
[30] Dkt. No. 82, Def. Ex. 8 at 33, 38-39, A96-A97; Pl. Ex. 2 at 17-18, 47, 51-53, 119, 214-15, B58, B65-B67, B83, B107.
[31] Def. Ex. 13-14 at A227, A229.
[32] Dkt. No. 20 ¶ 47; Dkt. No. 82, Def. Ex. 8 at 35-38, A96-97; Dkt. No. 25 ¶ 44 (Def. B2B's Answer to Pl.'s First Amended Complaint).

bulkhead.[33]  On or about June 25, 2014, ABF repudiated its contract with B2B Supply for the

sale of the bulkheads, and returned the bulkheads to B2B Supply.[34]  ABF's counsel sent a letter

to counsel for B2B Supply, stating that ABF "believe[d] that Mr. Squyres . . . made material

misrepresentations and/or omissions to ABF relating to B2B's rights pertaining to the bulkheads

and decking beams he intended to supply and S-Line's patents."[35]  When discussing the

manufacturing of the bulkheads, Hooten relied on Squyres' representations that the '462 Patent

had never been "protected," and that S-Line never "registered" a patent.[36]  Lance Hooten

testified that Hooten's was "in a half million dollar pinch," after S-Line filed this lawsuit, which

required Hooten's to sell most of the raw materials to S-Line, except for $80,000 worth of

brackets.[37]

### D.  S-Line Files Suit Against B2B and Squyres

On May 13, 2014, S-Line's parent company, Heico Holding, Inc., sent a cease-and-desist

letter to Squyres, informing him that he was infringing the '462 Patent, and asked for written

assurances no later than May 30, 2014 that he and B2B Supply had ceased and would continue to

desist from infringing the '462 Patent.[38]  On May 20, 2014, ABF sent Squyres and B2B Supply

another letter, requesting confirmation that the bulkheads it directed Hooten's to manufacture

and deliver to ABF did not infringe any patents assigned to S-Line.[39]  S-Line and B2B Supply

each entered into release agreements with ABF.[40]

---

[33] Dkt. No. 20-9, Pl. Ex. I.
[34] Def. Ex. 15 at A232.
[35] Dkt. No. 82, Def. Ex. 15 at A233.
[36] *Id.*, Def. Ex. 8 at 43-45, 74-76, 120, A98, A106, A117.
[37] *Id.*, Pl. Ex. 8 at 40-41, A97-A98
[38] Dkt. No. 20-10, Pl. Ex. J.
[39] Dkt. No. 20-11, Pl. Ex. K. The letter actually referred to the patent rights of Ancra International or any related entity.
[40] Def. Ex. 16-17 at A234, A239.

On June 23, 2014, S-Line filed its Original Complaint, alleging direct and induced infringement against B2B Supply and Squyres.[41]  On August 18, 2014, B2B Supply answered and asserted affirmative defenses.[42]  Squyres moved to dismiss the claims against him under Federal Rule of Civil Procedure 12(b)(6).[43]  On September 4, 2014, S-Line filed its First Amended Complaint against B2B Supply and Squyres.[44]  On September 18, 2014, Squyres moved under Rule 12(b)(6) to dismiss the claims of direct and induced infringement against him.[45]  On January 13, 2015, the Court denied Squyres' Motion to Dismiss.[46]  On January 27, 2015, Squyres filed his Answer to S-Line's First Amended Complaint.[47]

On April 20, 2015, Squyres filed a Motion for Partial Summary Judgment, arguing that there is no genuine dispute as to any material fact as to the claim against him, for which he claims he cannot be liable for direct infringement as a matter of law.[48]

## II.    LEGAL STANDARD

Summary judgment is warranted if the pleadings, discovery, disclosure materials, and supporting affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists when a reasonable jury could find for the nonmoving party.  *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 417 (5th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine dispute of

---

[41] Dkt. No. 1.
[42] Dkt. No. 15 (Def.'s Answer to Pl.'s Orig. Complaint).
[43] Dkt. No. 14 (Def.'s Mot. to Dismiss Claims in Pl.'s Orig.Complaint).
[44] Dkt. No. 20.
[45] Dkt. No. 24 (Def.'s Mot. to Dismiss Claims in Pl.'s First Amended Complaint).
[46] Dkt. No. 47 (Order on Mot. to Dismiss).
[47] Dkt. No. 53.
[48] Dkt. No. 80.

material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998) (citing *Celotex*, 477 U.S. at 325).  Once the movant carries its initial burden, the burden shifts to the nonmovant to designate specific facts beyond the pleadings that prove the existence of a genuine issue of material fact, and that summary judgment is not appropriate.  *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).  In determining whether genuine issues of material fact exist, "factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that an actual controversy exists."  *Lynch Props.*, 140 F.3d at 625 (citation omitted).

## III.    DISCUSSION

### A.  Applicable Law

To find an officer of a corporation personally liable for direct infringement under 35 U.S.C. § 271(a), there must be sufficient evidence to pierce the corporate veil.  *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1331 (Fed. Cir. 1999) (citing *Manville Sales Corp. v. Paramount, Inc.*, 917 F.2d 544, 552 (Fed. Cir. 1990)); *see also Wordtech Systems, Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1313 (Fed. Cir. 2010).  Because the law governing alter ego liability and piercing the corporate veil is not unique to patent law, the Federal Circuit applies the law of the regional circuit, which in turn applies the law of the state where the case is pending.  *See Insituform Technologies, Inc. v. CAT Contracting, Inc.*, 385 F.3d 1360, 1380 (Fed. Cir. 2004) (citations omitted).  Under Texas law, the corporate form may be disregarded under any of three separate theories:  "(1) the corporation is the alter ego of its owners or shareholders, (2) the corporation is used for an illegal purpose, and (3) the corporation is used as a sham to

perpetrate a fraud." *Fid. & Deposit Co. of Maryland v. Commercial Cas. Consultants, Inc.*, 976 F.2d 272, 274–75 (5th Cir. 1992) (citing *Castleberry v. Branscum*, 721 S.W.2d 270, 272–73 (Tex. 1986), *superseded on other grounds by* Tex. Bus. Orgs. Code § 21.223).

In *Castleberry v. Branscum*, the Supreme Court of Texas held that the corporate structure of a corporate defendant may be disregarded upon a showing of constructive fraud. 721 S.W.2d at 272. However, the Texas Legislature abrogated the *Castleberry* holding, in part, when it enacted Section 21.223 of the Texas Business Organizations Code ("Section 21.223"), which absolves shareholders and their affiliates from liability for the contractual obligations of a corporation or for any matter arising from those obligations. Tex. Bus. Orgs. Code § 21.223 ("A holder of shares . . . or any affiliate of such a holder . . . may not be held liable to the corporation or its obligees with respect to . . . any contractual obligation of the corporation or any matter relating to or arising from the obligation . . . ."). However, Section 21.223, does permit the imposition of liability on a shareholder or affiliate that "cause[s] the corporation to be used for the purpose of perpetrating and d[oes] perpetrate an actual fraud on the obligee . . . ." *Id.* Thus, for contractual obligations, the corporate veil can be pierced only when actual fraud is proven.

However, for the purposes of this case, the Court notes that patent infringement is a tort. *See Carbice Corp. of Am. v. Am. Patents Dev. Corp.*, 283 U.S. 27, 33 (1931). While some courts have held that Section 21.223 extends to ancillary torts that arise from a contractual obligation, torts that do not arise out of any contractual obligation are not subject to Section 21.223. *See In re Antone's Records, Inc.*, 445 B.R. 758, 788 (Bankr. W.D. Tex. 2011) (citing *Menetti v. Chavers*, 974 S.W.2d 168, 174 (Tex. App.—San Antonio 1998, no pet.); *Aluminum Chemicals (Bolivia), Inc. v. Bechtel Corp.*, 28 S.W.3d 64, 68 (Tex. App.—Texarkana 2000, no pet.); *Harco Energy, Inc. v. Re-Entry People, Inc.*, 23 S.W.3d 389, 397 (Tex. App.—Amarillo 2000, no pet.);

*Formosa Plastics Corp., USA v. Kajima Int'l, Inc.*, 216 S.W.3d 436, 462 n. 8 (Tex. App.—Corpus Christi 2006, pet. denied).

Squyres argues that he is an "affiliate" of B2B Supply under Section 21.223(a)(2) because he is an employee of B2B Supply and married to its sole shareholder, and/or because this patent infringement action arises out of B2B Supply's contractual obligation to sell bulkheads to ABF.

Here, the alleged patent infringement by B2B Supply and Squyres did not arise from a contractual obligation, nor is it an ancillary tort to a contractual obligation between B2B Supply and S-Line.  There was no contract between S-Line and either B2B Supply or Squyres at the time the alleged infringement took place, nor were Squyres or B2B Supply the assignee of a contract between S-Line and another party.  *See Kirkindoll v. Nat'l Credit Union Admin. Bd.*, No. 3:11-CV-1921-D, 2014 WL 7178005, at *9 (N.D. Tex. Dec. 17, 2014) (Fitzwater, J.) (quoting *Allan v. Nersesova*, 307 S.W.3d 564, 571 (Tex. App.—Dallas 2010, no pet.)).

The legislature enacted Section 21.223 to supplant the decision in *Castleberry* court with respect to piercing the corporate veil to impose liability on individuals for a corporation's contractual obligations.  The Fifth Circuit has concisely explained the balancing rationale for applying different liability standards to contractual and tort claimants:

> This balancing in part reflects a distinction . . . the perceived relative equities of veil-piercing claimants who are asserting tort theories of recovery versus those suing in contract.  The basic notion was that contract claimants, unlike most third parties suing in tort, had voluntarily chosen to deal with the corporation and, absent some deception or fraud, would have had the opportunity to apportion, through negotiated contract terms, the risk that the entity would be unable to meet its obligations.

*Spring St. Partners-IV, L.P. v. Lam*, 730 F.3d 427, 444 (5th Cir. 2013) (quoting *Shook v. Walden*, 368 S.W.3d 604, 620 (Tex. App.—Austin 2012, pet. denied)).  Here, S-Line did not voluntarily

choose to deal with B2B Supply, and thus had no opportunity to "apportion, through negotiated contract terms, the risk that [B2B Supply] would be unable to meet its obligations." *See id*. Because S-Line's infringement claim arose from B2B Supply's voluntary dealings with ABF, a third party, Squyres cannot rely on Section 21.223. Therefore, S-Line need not meet the heightened actual fraud requirement of Section 21.223 that would otherwise protect Squyres from liability. In other words, when a plaintiff seeks to pierce the corporate veil to impose liability for a tort not arising out of a contract, *Castleberry* remains controlling, which means proof of constructive fraud will suffice to pierce B2B Supply's corporate veil and hold Squyres personally liable.

### B.  Piercing the Corporate Veil

"[I]n general, a corporate officer is personally liable for his tortious acts, including patent infringement, just as any individual may be liable for a civil wrong." *Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1313 (Fed. Cir. 2010) (quoting *Hoover Group, Inc. v. Custom Metalcraft, Inc.*, 84 F.3d 1408, 1411 (Fed. Cir. 1996)). "However, the 'corporate veil' shields a company's officers from personal liability for direct infringement that the officers commit in the name of the corporation, unless the corporation is the officers' 'alter ego.'" *Id.* (citing *Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1295 (Fed. Cir. 2007)). Accordingly, "[t]o determine whether corporate officers are personally liable for the direct infringement of the corporation under [35 U.S.C.] § 271(a) requires invocation of those general principles relating to piercing the corporate veil." *Id.* (quoting *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1579 (Fed. Cir. 1986)).

In *Castleberry*, the Supreme Court of Texas identified multiple scenarios in which the corporate veil can be pierced to impose personal liability on an individual, two of which are

relevant here: (1) the corporation is merely the alter ego of the individual, and (2) the corporation
is a sham to perpetrate a fraud.  721 S.W.2d at 272.

### 1.  Alter Ego

A corporation is an alter ego of an individual when "there is such unity between [the]
corporation and [the] individual that the separateness of the corporation has ceased and holding
only the corporation liable would result in injustice."  *Id.*  In *Castleberry*, the Texas Supreme
Court directed courts to consider the following factors in determining whether a corporation is an
alter ego: "the degree to which corporate formalities have been followed and corporate and
individual property have been kept separately, the amount of financial interest, ownership and
control the individual maintains over the corporation, and whether the corporation has been used
for personal purposes."[49]  *Id.*

Here, the parties dispute whether Squyres owns and/or maintains a financial interest in
B2B Supply.  Squyres argues that he is not a shareholder of B2B Supply, and that he has no
financial interest in or ownership of B2B.  Squyres also argues that his lack of a financial interest
in B2B means he cannot, as a matter of law, be held liable under an alter ego theory of liability.
Squyres is correct to note that "[t]he great weight of Texas precedent indicates that, for the alter
ego doctrine to apply against an individual under this test, the individual must own stock in the

---

[49] In *Instituform Technologies Inc. v. Cat Contracting Inc.*, relied upon by Plaintiff, the court
used the following six factors, in addition to the *Castleberry* factors, to test for alter ego: "(1) the
corporation is undercapitalized; (2) without separate books; (3) its finances are not kept separate
from the entity's finances, the entity's obligations are paid by the corporation; (4) the corporation
is used to promote fraud or illegality; (5) corporate formalities are not followed; or (6) the
corporation is merely a sham." No. CIV.A.H-90-1690, 1999 WL 33914622, at *24 (S.D. Tex.
Aug. 30, 1999) (citation omitted), *rev'd in part on other grounds, vacated in part*, 10 Fed. App'x
871 (Fed. Cir. 2001) *cert. granted, judgment vacated*, 535 U.S. 1108, 122 S. Ct. 2322, 153 L. Ed.
2d 151.  To the extent the *Instituform* court considered factors not discussed by the Supreme
Court of Texas in *Castleberry*, this Court will rely on *Castleberry*.  However, the Court finds that
the application of either set of factors demonstrates that there is a genuine issue of material fact
as to whether B2B Supply is the alter ego of Squyres.

corporation." *Bollore S.A. v. Imp. Warehouse, Inc.*, 448 F.3d 317, 325 (5th Cir. 2006); *see also*

*Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635, 643 (5th Cir. 1991) ("Texas

courts will not apply the alter ego doctrine to directly or reversely pierce the corporate veil unless

one of the 'alter egos' owns stock in the other."); *Zahra Spiritual Trust v. U.S.*, 1992 WL 739456

(W.D. Tex. 1992), *aff'd*, 38 F.3d 569 (5th Cir. 1994) (holding a beneficial ownership interest was

an insufficient financial interest under an alter ego theory of liability); *Patterson v. Wizowaty*,

505 S.W.2d 425, 428 (Tex. Civ. App.—Houston [14th Dist.] 1974, no pet.) ("[T]here is no Texas

authority for the proposition that an individual can be held personally liable under the alter ego

doctrine when he owns none of the outstanding stock of the corporation.").

      S-Line acknowledges that Elizabeth Squyres is the sole owner of B2B, but argues that

Squyres' community property interest under Texas law is a sufficient ownership interest for

Squyres to be liable under an alter ego theory.[50]

      When applying Texas law, courts within the Fifth Circuit look to the Supreme Court of

Texas for guidance. *Citigroup Inc. v. Fed. Ins. Co.*, 649 F.3d 367, 371 (5th Cir. 2011).  In the

absence of a binding decision from the Supreme Court of Texas on a disputed issue, this Court

may look to decisions of intermediate state appellate courts for guidance, but those decisions are

---

[50] Squyres heavily relies on the Fed. R. Civ. P. 30(b)(6) deposition of S-Line's corporate
representative who, for example, in response to the question, "Is it S-Line's contention that Mr.
Squyres has a financial interest in B2B Casuals?" answered "I don't think that's being a
contention,[t]hat's not a contention either."  The representative further testified that "[He didn't]
believe S-Line knows [whether Squyres has some sort of a financial interest in B2B]."  *See* Dkt.
No. 81 at 20 (Def. Br. at 15); Def. Ex. 18 at 35, 37, A251-A252.  Squyres argues that these
"admissions" by S-Line's corporate representative are "quite telling," and go unaddressed by S-
Line.  Dkt. No. 91 at 2 (Def. Reply Br. at 2).  However, as a matter of law, the Court will weigh
this evidence along with all of the evidence before it, including the fact that Squyres has a
community property interest in his wife's shares of B2B stock.  *Compare* Def. Ex. 18 at 37,
A252 (Q:  "Does S-Line contend that B2B Casuals has failed to comply with any required
corporate formalities?"  A:  "I can't think of any."); *with* Dkt. No. 86 at 7–8 (Pl. Resp. Br. at 2–
3) (citing evidence that B2B failed to file public information reports or keep minutes for certain
years and transactions).  The Rule 30(b)(6) testimony is not dispositive.

not necessarily controlling, and this Court must ultimately make a judgment as to how the Supreme Court of Texas would rule on the issue. *United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.*, 414 F.3d 558, 565–66 (5th Cir. 2005). Texas law provides little guidance on whether a community property interest constitutes a sufficient ownership interest to allow for piercing the corporate veil under an alter ego theory of liability. However, Texas law is clear that stocks purchased by either spouse during the marriage are community property. *See Bobbitt v. Alamo Cas. Co.*, 241 S.W.2d 464, 466 (Tex. Civ. App.—Galveston 1951, writ ref'd n.r.e.) ("We do not understand [why] appellants are insisting that the shares of stock which [issued] in the name of Mrs. Laird were her separate property. In any case, the court was authorized to find . . . that the ownership of the shares of capital stock of Elmer W. Laird, Inc., was community property of Elmer W. Laird and his wife."); *Brand v. Brand*, 102 S.W.2d 310, 312 (Tex. Civ. App.—Beaumont 1937, no writ) ("At the date of the marriage appellee had 40 shares of the Gulf Oil Company stock. This was all paid for except the sum of $120, which was afterwards paid. This $120 was community property."). All property possessed by either spouse during marriage is presumed to be community property. Tex. Fam. Code § 3.003. Squyres has not produced the clear and convincing evidence required to rebut this presumption. *Id; see Rippy v. Rippy*, 49 S.W.2d 494, 496 (Tex. Civ. App.—Austin 1932, writ ref'd) (explaining that oil stock held in husband's name was statutorily presumed to be community property, absent evidence that it was separate property or purchased with his separate funds.). Jerrell and Elizabeth Squyres were married before the creation of B2B Supply.[51] B2B was financed using community funds, including a loan from Squyres' corporation, JPS, that was never repaid.[52] No pre-martial or post-marital agreements exist between Jerrell and Elizabeth that would preclude him from having a

[51] Dkt. No. 82 at A28.
[52] *Id.* at A28-29.

14

community property interest in B2B Supply.[53]

Moreover, the B2B Supply stock purchased by Elizabeth Squyres does not fall under any of the classes of separate property defined by Texas statute. Tex. Fam. Code § 3.001 ("A spouse's separate property consists of: (1) the property owned or claimed by the spouse before marriage; (2) the property acquired by the spouse during marriage by gift, devise, or descent; and (3) the recovery for personal injuries sustained by the spouse during marriage . . . ."). Therefore, in light of the evidence before the Court, and the Court's interpretation of Texas marital property law, Elizabeth Squyres' ownership interest in B2B Supply is community property.

This Court finds the Ninth Circuit's decision in *Firstmark Capital Corp. v. Hempel Financial Corp.* persuasive, holding that a community property interest is sufficient ownership interest under California law to support piercing the corporate veil under an alter ego theory. 859 F.2d 92, 94 (9th Cir. 1988). The Court also notes that, in divorce cases, Texas courts have "reverse pierced" the corporate veil under alter ego theory to "characterize as community property corporate assets that would otherwise be the separate property of one spouse." *Lifshutz v. Lifshutz*, 61 S.W.3d 511, 516 (Tex. App.—San Antonio 2001, pet. denied); *see, e.g., Zisblatt v. Zisblatt*, 693 S.W.2d 944 (Tex. App.—Fort Worth 1985, writ dism'd w.o.j.). In other words, Texas courts have applied an alter ego theory to recharacterize separate corporate assets as community property "in order to achieve an equitable result." *Id.* at 952. Similarly, this Court characterizes Elizabeth Squyres' B2B stock ownership as community property so as to permit an alter ego analysis and achieve an equitable result. Therefore, Squyres' community property interest in B2B Supply, obtained through his wife's ownership of the shares of B2B Supply, is sufficient to satisfy the ownership requirement for piercing the corporate veil under an alter ego

---

[53] *Id.* at A29-30.

theory.

Having found that there is at least a genuine dispute of material fact regarding whether Squyres has a sufficient ownership interest for S-Line to rely on an alter ego theory of liability, *Castleberry* instructs this Court next to examine "the total dealings of the corporation and the individual," to determine whether there is a genuine dispute of material fact regarding whether B2B Supply is the alter ego of Squyres.  721 S.W.2d at 272.

The parties dispute the degree of control Squyres maintained over B2B Supply.  Squyres argues that he is just an employee of B2B, and not an officer or director.  S-Line responds that Squyres prepared and drafted the narrative for a B2B YouTube promotional video that was sent to its customers and vendors.[54]  Elizabeth Squyres became aware of the video after it was posted on YouTube, and did not attempt to correct what she now claims is incorrect.[55]  The video remained publicly accessible for more than a year after it was posted.  Squyres responds that the video has not been widely viewed, and that S-Line has provided no evidence of bad intent or deception on the part of Squyres, or that anyone at ABF or Hooten's viewed the video and relied on it in forming their opinion about Squyres' role at B2B.  However, Squyres misinterprets the role of this evidence in the alter ego analysis.  The issue is to what degree Squyres exercised control over B2B Supply, and this YouTube video, along with the other evidence before the Court, shows that there is at least a genuine issue of material fact regarding Squyres' position within, and degree of control over, B2B Supply.

The parties further dispute whether B2B Supply has observed corporate formalities. Squyres argues that B2B Supply was properly formed under Texas law and operates under formal bylaws, records and keeps its minutes, and files all necessary periodic filings with the

---

[54] Dkt. No. 87 at B158-61.
[55] Dkt. No. 82

16

Texas Secretary of State.[56]  S-Line responds that B2B Supply did not file annual public information reports in 2006, 2007, 2010, or 2011,[57] that there is no record of minutes being kept in 2006, 2007, 2009, 2010, or 2012,[58] that Elizabeth Squyres did not sign the minutes kept in 2011,[59] and that several vendor and customer agreements (including those with ABF and Hooten's) were not documented in the minutes.[60]  Thus, the Court finds that there is a genuine issue of material fact as to whether B2B Supply observed corporate formalities during the time period in question.

The parties also dispute whether B2B Supply and Squyres have comingled their property. Squyres argues that there is no evidence of commingling, but S-Line has provided evidence that B2B paid for the personal expenses of Jerrell and Elizabeth Squyres.[61]  Thus, again, there is a genuine dispute of material fact regarding the separateness of B2B and Squyres' property.

In addition to the *Castleberry* factors, courts have also viewed "grossly inadequate capitalization, as measured by the nature and magnitude of the corporate undertaking, as an important factor in determining whether personal liability should be imposed."  *Tigrett v. Pointer*, 580 S.W.2d 375, 382 (Tex. Civ. App.—Dallas 1978, writ ref'd n.r.e.); *Nat'l Marine Serv., Inc. v. C. J. Thibodeaux & Co.*, 501 F.2d 940, 942 (5th Cir. 1974); *Endsley Elec., Inc. v. Altech, Inc.*, 378 S.W.3d 15, 23 (Tex. App.—Texarkana 2012, no pet.).  S-Line has presented evidence that B2B was undercapitalized and did not have the capital to finance the bulkhead contract with ABF, and commissioned Hooten because it did not have the manpower or facilities

---

[56] Dkt. No. 82 at A8, A11, A13, A25, A64, A70, A76.
[57] *Id.* at A70-75.
[58] *Id.* at A76-85.
[59] *Id.*
[60] *Id.* at A25-26, A36-38.
[61] *Id.* at A59.

to execute the contract.[62]  Squyres has not produced evidence to the contrary, so there is at least a genuine issue of material fact as to whether B2B Supply was undercapitalized.

For all these reasons, there are genuine issues of material fact regarding whether the corporate veil of B2B Supply can be pierced under an alter ego theory.

### 2.   Sham to Perpetrate a Fraud

To pierce the corporate veil by showing the corporate form is being used as a sham to perpetrate a fraud, tort claimants need only show constructive fraud. *Castleberry*, 721 S.W.2d at 273.  Whereas "[a]ctual fraud usually involves dishonesty of purpose or intent to deceive . . . constructive fraud is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests." *Archer v. Griffith*, 390 S.W.2d 735, 740 (Tex. 1964).  To prove constructive fraud, a plaintiff must show that "recognizing the separate corporate existence would bring about an inequitable result." *Castleberry*, 721 S.W.2d at 272–73 (citation omitted). "Examples of an inequitable result are when the corporate structure has been abused to perpetrate a fraud, evade an existing obligation, achieve or perpetrate a monopoly, circumvent a statute, protect a crime, or justify [a] wrong." *Spring St. Partners-IV*, 730 F.3d at 443 (internal quotation marks and citation omitted).  S-Line argues that Squyres engaged in a sham in conducting the business of B2B Supply, and it would lead to an inequitable result if this Court were to recognize the corporate form of B2B.

The elements of fraud are:

(1) a material misrepresentation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made the statement recklessly without any knowledge of the truth; (4) the speaker made the representation with the intent that the other party should act on it; (5) the party acted in reliance on the

---

[62] *Id.* at A96-97.

representation; and (6) the party thereby suffered injury.

*Texas Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348,

366 (Tex. App.—Dallas 2009, pet. denied) (citing *Formosa Plastics Corp. USA v. Presidio Eng's*

*& Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998)).  Fraud by nondisclosure is a type of fraud.

*Id.* (citing *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997)).  Although

fraudulent intent is a requirement of actual fraud, the actor's intent (the fourth *Texas Integrated*

factor) is irrelevant for constructive fraud.  *Id.* (citing *Barnett v. Barnett*, 67 S.W.3d 107, 126

(Tex. 2001)).

The parties dispute whether Squyres used B2B Supply to promote a fraud.  S-Line has

presented evidence that Squyres made a material misrepresentation or omission to ABF relating

to B2B Supply's rights in the '462 Patent and the bulkheads it intended to supply to ABF, and S-

Line claims Squyres had a duty to fully disclose B2B Supply's and Squyres' interest and

knowledge of the patent,[63] and that ABF would not have entered into the contract had it fully

known about the '462 Patent.  S-Line provides evidence that Squyres questioned the

enforceability of the '462 Patent, and Hooten relied on Squyres' assessment of the '462 Patent by

entering into the agreement with B2B Supply and purchasing the raw materials for the

bulkheads, including $80,000 in brackets.[64]  S-Line argues that Squyres, as a named inventor of

the '462 Patent should have known that the Patent was fully enforceable, implying that Squyres

must have made misrepresentations or omissions to induce Hooten's and ABF to enter into the

agreement.  S-Line has also presented evidence that, although Squyres told ABF he would

"professionally bow out" when S-Line filed its lawsuit, he secretly contacted Hooten and asked

Hooten to raise the price of the bulkheads so that he [Squyres] could receive a commission on

---

[63] *Id.* at B71, B109-10.
[64] Dkt. No. 82 at A98-99, A106, A117.

the back end.[65]  Squyres responds that his conversations with ABF and Hooten's concerned his

attempts to design around the '462 Patent, which he ultimately did when he designed and

engineered the accused device, and that that is all legal and proper.  However, the representations

Squyres made to ABF and Hooten's are disputed, and in fact, ABF's counsel sent a letter to B2B

Supply, alleging that Squyres made misrepresentations regarding the '462 Patent.  This letter,

together with the other evidence, at least creates a fact issue regarding whether Squyres made

misrepresentations on which ABF and Hooten's relied.

    S-Line further argues that Squyres misrepresented to the public and ABF his role at B2B

Supply.  Specifically, S-Line relies on the statement by Squyres that he was President of B2B

Supply in the YouTube video, and that B2B Supply did not correct this statement after

discovering it.[66]  S-Line has also presented evidence that Squyres represented himself to Hooten

"as an individual, outside of any other companies that he [Squyres] was affiliated with," and not

as a sales agent of B2B Supply.[67]  The fact that Squyres participated in making the video, on

behalf of B2B Supply, and that neither Jerrell nor Elizabeth corrected the video over the year it

was publicly available, creates a genuine dispute of material fact as to whether it was Squyres'

intention to hold himself out as an officer of B2B for the purposes of generating business for, and

dealing with customers of, B2B Supply.  In fact, the evidence shows that Lance Hooten was, at a

minimum, confused about Squyres' role with B2B.

    Moreover, S-Line contends that Squyres used B2B to engage in activities barred by his

non-compete agreement.[68]  Squyres responds that S-Line is improperly attempting to impute the

activities of B2B Supply to Squyres, and that neither B2B Supply nor Elizabeth Squyres were

---

[65] Dkt. No. 87 at B69, B194-95.
[66] Id. at B158-61.
[67] Dkt. No. 82 at A96.
[68] Dkt. No. 87 at B75-76, B196-97, B202-11.

subject to any non-compete agreements with S-Line.  The e-mail to ABF confirming the sale of

the bulkheads was sent by Squyres from a B2B e-mail address, but Squyres' Employment

Agreement prohibited him from "directly or indirectly through another entity or otherwise, in

any manner engag[ing] in the Business or in any activity that directly or indirectly competes with

the Business . . . ."[69]  Accordingly, Squyres would still violate the non-compete provisions of his

Employment Agreement by acting through B2B Supply.  The issue is whether Squyres was using

B2B Supply to do so, and S-Line has produced evidence that at least creates a genuine dispute

regarding this material fact.

Squyres may successfully persuade a jury that the evidence does not show that he used

B2B Supply to perpetrate a fraud; however, that is not this Court's task at summary judgment.

In the Court's view, the evidence produced by S-Line demonstrates that there are genuine

disputes of material fact about whether the corporate veil of B2B Supply can be pierced under

the sham theory to hold Squyres individually liable for direct patent infringement.

## IV.   CONCLUSION

For the reasons stated above, Defendant Squyres' Motion for Partial Summary Judgment is

**DENIED**.

**SO ORDERED**.

August 10, 2015.

**BARBARA M. G. LYNN**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF TEXAS**

---

[69] Dkt. No. 82-3, Pl. Ex. 10 at B184 ¶ 10(a); Dkt. No. 87-6, Pl. Ex. 10 at B197.